ST. LOUIS SOUTHWESTERN RY. CO. v. WILKES.

(Court of Civil Appeals of Texas. Texarkana. May 15, 1913. On Motion for Rehearing, July 3, 1913.)

1. NEGLIGENCE (§ 56*)—PROXIMATE CAUSE OF INJURY—VIOLATION OF STATUTE.

Negligence due to the violation of a statute does not give a right of action, unless the violation was the proximate cause of the injury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 69, 70; Dec. Dig. § 56.*]

2. NEGLIGENCE (§ 61*)—PROXIMATE CAUSE OF INJURY—CONCURRENT CAUSES.

Where several efficient causes contribute to an accident, each cause, without the operation of which the accident would not have happened, is a proximate cause.

[Ed. 'Note.—For other cases, see Negligence, Cent. Dig. §§ 74, 75; Dec. Dig. § 61.*]

3. MASTER AND SERVANT (§ 285*)—MASTER'S LIABILITY FOR INJURIES TO SERVANT—PROXIMATE CAUSE OF INJURY — QUESTION FOR JURY.

In an action for injuries received by the conductor of a freight train in a collision between the separate sections of the train which had pulled apart, evidence *held* to warrant the submission to the jury of the question whether the failure of the company to comply with the safety appliance act (Act 31st Leg. c. 26), requiring 75 per cent. of the cars to be equipped with air brakes, was the proximate cause of the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1002, 1003, 1007, 1008, 1016, 1035, 1043, 1053; Dec. Dig. § 285.*]

4. MASTER AND SERVANT (§ 287*) — INJURIES TO SERVANT—ORDERS OF TRAIN DISPATCHER —QUESTION FOR JURY.

In an action for injuries received by a conductor, evidence *held* to warrant the submission to the jury of the question whether the conductor was ordered by the train dispatcher to bring in certain "bad order" cars, either directly or under the instructions of the foreman of a wrecking crew.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1034, 1045, 1051, 1052, 1054–1067; Dec. Dig. § 287.*]

5. APPEAL AND ERROR (§ 1033*) — HARMLESS-ERROR—ERROR FAVORABLE TO APPELLANT.

Where a wrecking foreman had authority from the dispatcher to order a conductor to bring in certain cars, error in an instruction, which required the jury to find that the conductor had special orders from the dispatcher to bring in the cars, was favorable to the railroad company.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4052–4062; Dec. Dig. § 1033.*]

On Motion for Rehearing.

6. MASTER AND SERVANT (§ 204*)—INJURIES TO SERVANT — VIOLATION OF STATUTE BY SERVANT—ASSUMPTION OF RISK.

If the conductor of a freight train voluntarily connects with the train two "bad order" cars, and thereby reduces the number of cars equipped with air brakes, below the 75 per cent. limit fixed by law, he cannot recover for any injury proximately caused thereby.

[Ed. Note.—For other cases. see Master and Servant, Cent. Dig. §§ 544–546; Dec. Dig. §. 204.*]

Levy, J., dissenting in part.

Appeal from District Court, Smith County; R. W. Simpson, Judge.

Action by U. T. Wilkes against the St. Louis Southwestern Railway Company. Judgment for the plaintiff, and defendant appeals. Reversed and remanded, on rehearing.

Appellee received bodily injury while in the service of appellant as conductor operating a freight train. The train, at the time of the injury, was made up, and in the order of an engine and tender, merchandise car, the six cars composing the "wrecking outfit," a coal hoist, coal car, three box cars, caboose, and box car, making 14 cars besides the tender. The coal hoist was on two trucks and was an old one, and was chained up at both ends to the train. The three box cars ahead of the caboose, and the box car behind the caboose, were bad-order empty cars, being carried to the car shop for repair; two of them had been damaged in a wreck, and the other one had the drawhead pulled out. The car just ahead of the caboose was the one that had a drawhead out, and it was held to the rear end of the car ahead of it by means of chains. Appellant's foreman of the wrecking crew and several of his crew, besides the train crew, were on the train. As the train was approaching the station of Murchison the engineer whistled for the station, and the conductor signaled him not to stop, but go on, and the engineer answered the signal by a whistle. Immediately after the engineer answered the signal there occurred a violent jam, or impact, of the cars, doing considerable damage to the coal hoist and the bad-

order cars. Appellee at the time was riding in the cupola of the caboose, and by reason of the jar incident to the collision he was thrown from the cupola to the floor, receiving severe and grievous injury. Immediately after this collision several of those on the train examined the cars and the situation on the ground. The testimony of these witnesses agreed that the collision occurred by reason of a separation of the train line into two parts, and such rear end running into the head end as it slowed up for Murchison. This conclusion is warranted by the evidence, for the reason that the violent impact of the cars as shown was not likely to have resulted except from a separation of the train into two parts. It does not appear that any of the crew saw or knew of any separation of the train line at the time, and this is accounted for as being due to the darkness of the night. The condition of the cars, and the situation on the ground after the collision, sufficiently indicated that the train line became separated into two parts in transit, either between the two cars ahead of the caboose by reason of the chain that held such cars together becoming unhooked, or at the coal hoist by reason of the disarrangement of the chain that held it to the next car. The testimony shows that the hooks were placed in the links of the chain without being tied therein, and that the slack in the chain had worked the hook out of the link or disarranged it. The facts show that less than 75 per centum of the cars in the train were equipped with air brakes connected up and working. The facts are given in more detail hereinafter. Appellee pleaded as grounds of negligence on the part of appellant proximately causing the injury: (1) "To operate and cause to be operated a train composed such as was the train in which this plaintiff was in charge, in this, to wit, that it was a violation of the rules and regulations of defendant to handle in the same train bad-order cars and merchandise freight cars"; and (2) "to operate and cause to be operated a train over its said line insufficiently equipped with air, in that less than 75 per cent. of the cars of said train were equipped with power—or train brakes, commonly known as air brakes"; and (3) "in the manner in which bad-order cars were incorporated in said train, in this, to wit, that the chains and fastenings in lieu of drawheads were insufficient and not securely fastened." The court submitted to the jury for finding of negligence the grounds of the petition numbered 2 and 3. The appellant pleaded general denial, and specially pleaded contributory negligence and assumed risk. The trial was to a jury, and a verdict was rendered in favor of appellee. The facts warrant a finding, as involved in the verdict, that appellant was guilty of negligence, in either or both grounds of negligence pleaded proximately causing the injury, and that appellee did not assume the risk, and the amount of damages is warranted by the evidence.

E. B. Perkins and D. Upthegrove, both of Dallas, and Marsh & McIlwaine, of Tyler, for appellant. Lasseter & McIlwaine and N. A. Gentry, all of Tyler, for appellee.

LEVY, J. (after stating the facts as above). [1] The court charged the jury that: "The law provides that 75 per centum of the cars in trains, such as the one in question, shall be equipped with power or train brakes. Now if you shall find that 75 per centum of the cars in the train at the time of the injury, if any, to plaintiff were not equipped with power or train brakes, and if you find that such fact, if you find it to be a fact, directly and proximately caused or contributed to cause the caboose in which plaintiff was riding to run into the other portion of the train from which it had been separated," etc. It is the claim of appellant by the first assignment of error that the failure to have 75 per centum of the cars equipped with power or train brakes was not the direct and proximate cause of the collision, and that therefore it was error to submit the issue as to whether the cars were so equipped. It is the rule, supported by the weight of authority, that while one who violates a statute may be regarded as a wrongdoer, and the act regarded as negligence, still it may or may not be the proximate cause of the injury complained of, according to the facts of the particular case. Negligence cannot create a right of action unless it is the proximate cause of the injury complained of by the plaintiff.

[2] However, as said in Ring v. City of Cohoes, 77 N. Y. 83, 33 Am. Rep. 574, upon a negligent happening, "where several proximate causes contribute to an accident, and each is an efficient cause, without the operation of which the accident would not have happened, it may be attributed to all or any of the causes; but it cannot be attributed to a cause unless without its operation the accident would not have happened." And such is the rule of the authorities.

[3] In the present case it appears to be true that as the train was approaching the station of Murchison there occurred a violent jam, or impact, of the cars somewhere in the rear part of the train ahead of the caboose, throwing appellee out of his seat in the cupola of the caboose to the floor, and he was thereby injured. The crew, who testified as witnesses, all account for the cause of the impact as being a separation of the train in transit into two parts, by reason of the chain that held two cars together, in lieu of drawheads, becoming unhooked, or disarranged, and the separated rear end running into the head end as it slowed up for the station. And upon all the facts stated by the witnesses the jury would have been fully authorized to find a negligent arrangement

of the chain by the wrecking crew, charged with the duty by appellant to securely arrange same. It further appeared from the evidence that the train consisted of 15 cars, including the tender of the engine; and, to meet the quantum of air brakes which must be carried in all trains of the kind here under the safety appliance act (Acts 31st Leg. c. 26) of this state, it was necessary that 12 of the cars be equipped with air brakes, assuming for the moment that the tender should be regarded as a car in such train line. There is sufficient evidence to show a failure to have as many as 12 of the 15 cars equipped with air brakes and connected up and working air in the train line ahead of the caboose. There is proof that if air brakes had been working on 12 cars next to the engine, and a separation of any of the 12 cars occurred, the breakaway in the train line would have caused the brakes on that portion to automatically set and stop the cars, and a serious collision would not have happened. Thus it would appear from the evidence that, although the separation of the train into two parts was by reason of the chain that held two cars together in the train becoming unhooked or disarranged, nevertheless the violent impact causing the injury would not have happened if the safety appliance act had been complied with. And it would not be in the province of the court to refuse to submit to the jury for them to determine whether the failure to equip 75 per centum of the cars with power or train brakes was an efficient cause of the injury, if the breakaway occurred between any of the 12 cars next to the engine in the train line. It can here be stated, in order that the contention be made clear, that the appellant insists that the evidence establishes that the breakaway occurred between the twelfth, and thirteenth cars, and that therefore the collision would have occurred even had the air on the 12 cars next the engine been connected up and working as required by law, and consequently the failure to comply with the terms of the law had nothing to do with the happening of the injury. The happening of the separation, or between what cars it occurred, was not seen or known of by the witnesses at the time or before the impact, and it rests in the opinion of the witnesses between what particular cars it first occurred, based on an examination of the cars and their condition and situation as it appeared after the collision. It was in the nighttime, and too dark to see a separation at the time, they say. Thus an explanation of the condition and situation of the cars, found immediately after the collision, together with the opinion of the witnesses in respect to the particular point of separation in the first instance, constitutes the evidence upon which it must be determined between which cars the separation occurred. The detailed description of the situation after the collision in some material respects makes it obscure and uncertain as to whether the separation first occurred between the twelfth and thirteenth cars, or between the coal hoist car and the car next to it, which was between the ninth and tenth cars. While the opinions of the witnesses, being expert in such matters, are entitled to weight, still such opinions are not conclusive, and must be considered along with all the facts detailed. And the opinion of the witness Woodall was conflicting with the opinion of the others.

It is not at all necessary to set out in detail all the evidence. We advert to the evidence of the foreman of the wrecking crew, who described the condition and situation found immediately after the collision, as being the more full and clear statement. He says he found the train separated both at a point between the coal hoist car and the coal car next it, which would be between the ninth and tenth cars, and at a point between the two box cars ahead of the caboose, which would be between the twelfth and thirteenth cars. The train was connected up and unbroken, he further says, from the engine to include all six cars of the wrecking outfit. The coal hoist car, which was next in the train to the last car of the wrecking outfit, was, he says, chained up to the last car of the wrecking outfit, but between the coal hoist car and the coal car the trucks of the coal hoist had slid out from under the center pin, and the center plate had come off, and the chain that was wrapped around the center plate and used to transport the car had come out and was parted, though hooked together, which "made the cars about five or six feet apart." The car behind the caboose and the car immediately in front of the caboose were connected up, but unconnected with the other cars; the distance of separation is not undertaken to be given by this or any witness, only that the car ahead of the caboose was not connected up with the car ahead of it. On the car ahead of the caboose the chain used to pull the car was found, the foreman says, unhooked and down on the ground, and there were evidences on the ground of where it had dragged for a distance of two miles. And upon the whole of the situation the foreman concludes that the breakaway first occurred on the car ahead of the caboose. The fact of the chain dragging two miles would be a strong circumstance, but not conclusive, for it is not probable that if the chains had been entirely disconnected the cars would have followed for two miles unless downgrade all that distance, and it does not appear from the evidence that it was downgrade. But notwithstanding the foreman had a belief as to the point of separation before collision, he admits that "I don't know which end broke in two first," and that is also true as to the other witnesses, for none of them saw or knew of the separation. As the location of the particular point of

separation that caused the impact rests entirely in inference from the circumstances, both from the standpoint of appellant and of appellee, it could not be said, we conclude, that it was so conclusively established that the separation first occurred between the twelfth and thirteenth cars as not to make it a matter of fact for the jury, as done by the court. We are also of the opinion, as a reason why the assignment could not be sustained, that appellee's contention has merit that the court would not be warranted, in order to determine the proximate cause of the injury as matter of law, in assuming that appellant could comply with the law and equip 75 per centum of the cars with air brakes, without having the caboose connected up with air, for there was evidence going to show that it was impossible to connect air on the coal hoist and the two cars immediately in front of the caboose.

[4] The court further instructed the jury, in connection with the charge in the first assignment, to the effect that appellee did not assume the risk resulting from the failure of Rhoderick to see that all of the cars in the train that could be equipped with power or train brakes were so equipped or connected up, and was not guilty of contributory negligence, upon the finding by them that the appellee was instructed by the chief dispatcher to bring in all cars directed by Rhoderick to be brought in, and that Rhoderick instructed appellee to put into and carry in the train certain cars at Athens, and that it was Rhoderick's duty to see that all cars that could be equipped with power or train brakes were so equipped or connected up with air. By the second assignment the point made against the charge is that there was no evidence that appellee was instructed by the chief dispatcher to bring, in his train to Tyler, all cars directed by Rhoderick, or that Rhoderick instructed the appellee to put into and carry the bad-order cars picked up at Athens, and it was error to submit such issue to the jury. Rhoderick was appellant's wrecking boss or foreman, and when on the road with his wrecking outfit, as here, it was in his line of duty to work on or repair bad-order cars found on the road, and to have transported to the shops for repair such cars as could not properly be fixed on the road. He testified that was his method of work and instructions. It was further his duty, when a bad-order car without a drawhead was to be incorporated into the train, to see that it was properly chained up. There is a sharp conflict of evidence between the appellee and Rhoderick as to whether, when a train is carrying the wrecking outfit, the conductor is subject to the orders and direction of the wrecking foreman as to the incorporation of bad-order cars into the train to be transported to the shops for repair. And the decision of the point of the assignment largely depends upon the authority of Rhoderick and the

character of this particular train to properly determine the duties that the conductor was expected to perform on that train. If Rhoderick had the authority, which was an issuable fact, to direct the carrying of the three bad-order cars in that train to the shops, then there was sufficient evidence to warrant the simple issue that Rhoderick instructed appellee to put into and carry the bad-order cars picked up at Athens, for the evidence admittedly shows that Rhoderick asked appellee to do so; and, if Rhoderick had authority over the conductor to direct that his cars be carried to the shops, the effect of the conductor's yielding to the request was equivalent to obedience to authority.

[5] And, moreover, if Rhoderick had authority over the conductor to direct the carrying of the bad-order cars to the shop on that train, then to further require appellee to show special instruction from the chief dispatcher, as was the effect of the court's charge, to carry such cars in the train, before appellee would be relieved of either assumed risk or contributory negligence in so doing, would not be a matter that appellant could well complain of as working injury. But if the question must depend upon authority from the dispatcher, and upon the construction that appellee could give to the orders of the dispatcher in respect to his duties as conductor of that particular train, there is room in the evidence to warrant the court in leaving that issue to the jury, we think, and the particular objection to the charge in this respect must be overruled for want of any evidence. The day before the present injury a wreck had occurred south of Athens, and Rhoderick was sent with his outfit from Tyler to clear the track; he also carried a new coal hoist that was intended to be installed at Corsicana in place of an old one at that place. After the wreck had been cleared he proceeded to Corsicana, and in the afternoon installed the new coal hoist; the old one, having been taken down, was chained by him to the rear of his wrecking outfit. Rhoderick then sent the following telegram to the superintendent: "The coal hoist has been put up and old one with wrecker chained up; wrecking outfit ready to go to Tyler and work all bad-order cars empty going north, and also use same crew on return. Will leave Corsicana at 7 a. m." It was explained that to "work" all bad-order cars was understood to mean, in railway parlance, to repair all such cars on the line that could be repaired there, and to carry to the shops for repairs all such cars that could not be properly repaired on the line. Rhoderick had been advised by the superintendent's office, where bad-order cars were located. After Rhoderick had sent his telegram it became necessary to get another crew, because of the 16-hour law, to pull the wrecking outfit back to Tyler, in place

159 S.W.—9

of the crew that brought it out of Tyler. With this intention the chief dispatcher, having authority from the superintendent to act addressed jointly to Rhoderick, the agent at Corsicana, the yardmaster, and the conductor of No. 34, the following message: "Arrange to give No. 34 the wrecker, and do not give him any dead freight or empties. Conductor will allow Foreman Rhoderick to repair bad-order cars on line and cut out other work that is not absolutely necessary." Appellee was the regular conductor on one of appellant's freight trains known as "34," and knew of the telegram Rhoderick had sent. The dispatcher testifies that he did not design by the telegram to run the train as the regular 34, a local, but as an extra to carry the wrecking outfit and to enable the wrecking crew to repair bad-order cars on the line. There is testimony that three merchandise cars were put into the train at Corsicana by subsequent telegram specially to that effect from the dispatcher, but the dispatcher disputes this. So, considering the purpose of running the train and of what it should consist from the standpoint and intention of the dispatcher, the jury could reasonably conclude that the train was virtually designed and intended to be run merely as an extra work train back to Tyler. And even if the jury believed that the dispatcher specially directed the incorporation of the three merchandise cars, so as to make it partly a revenue train and partly a work train, the conclusion could be reached by the jury, and is reasonably warranted, nevertheless that the carrying of these merchandise cars was incidental, and that the train was designed to be run especially and principally as an extra, and not as a regular, to carry back the wrecking outfit and perform all the duties that such character of train on the line would be expected and required to do. And if there was warrant in all the circumstances, which would have to be considered, we think, for the finding by the jury that the order to the conductor directed him to operate that train in the character of an extra work train, and that the conductor could reasonably have contemplated that it was expected of him to perform such duties and do such things in the operation that were usually done by that kind of train, then the regular rules governing what conductors shall do about the operation of regular schedule and revenue trains would not govern as conclusively establishing the authority of the conductor under the telegram as to this particular train, which was not covered by such rules. Looking only to a part of the telegram, it does say that the conductor "will allow Foreman Rhoderick to repair bad-order cars on the line." But the telegram does not in terms say that such bad-order cars shall not be carried to the shops. And therefore, to determine the scope of the conductor's authority, the whole telegram should be considered, and in the light of the circumstances interpreted. And when the telegram is read as a whole, and in the light of Rhoderick's telegram to the dispatcher, and his previous advisement of where bad-order cars were located, and the purpose of running the extra, and what was usual for such character of train to do about bad-order cars, the conclusion might reasonably be reached by the jury that the instruction of the dispatcher, not only meant for the conductor to run the train as an extra work train, but that there was included authority for the usual carrying in to the shop of bad-order cars. The sentence "will allow Foreman Rhoderick to repair bad-order cars on the line" might be considered, in the light of all the facts, as being not restrictive of all the duties about bad-order cars to be performed, but merely as an additional special direction above and besides the usual things to be done. We cannot say there is no evidence for the jury, and the assignment is overruled.

By the third assignment the court's charge is complained of. The court further charged the jury, in connection with the charge complained of in the first and second assignments, as follows: "If, however, you shall find * * * it was, under all the facts and circumstances in evidence, plaintiff's duty on the occasion at Athens to see that 75 per centum of the cars in the train when it left Athens were equipped with power or train brakes, then if you find that the plaintiff voluntarily incorporated certain cars in the train at Athens, which left the train with less than 75 per centum of the cars in said train equipped with power or train brakes, or if he instructed Rhoderick not to equip the cars incorporated in the train at Athens with power or train brakes, and if Rhoderick failed to so equip cars under plaintiff's instructions, and thereby the cars in the train were equipped with less than 75 per centum of power or train brakes, and if you find that such failure, if any, to so equip said train caused or contributed to cause the collision, and plaintiff was injured thereby, then you are instructed he was guilty of contributory negligence; or, * * * if you have found it was plaintiff's duty to see that 75 per centum of the cars in the train when it left Athens were equipped with power or train brakes, and if plaintiff knew, or if by that circumspection which an ordinarily prudent and cautious person would use in the performance of his service under the same or similar circumstances would have known, that said train was not equipped with 75 per centum of power or train brakes, and if he knew the danger, if any, incident to operating the train so equipped, or ought to have known of such danger, if any, by that circumspection in the performance of his duties which an ordinarily prudent and cautious person would have used under the same or similar circumstances, and a person of ordinary care would

not have continued with said train so equipped, he assumed the risk of so continuing with the train, and cannot recover on the ground that the train was equipped with less than 75 per centum of power or train brakes at the time of the collision." The point made against the charge is to the effect that, as appellee was charged with the duty under the rules to see that the terms of the safety appliance act were complied with in the operation of the train, he was the agent of appellant for the purpose of seeing that the law was complied with, and that his incorporation of, or causing to be incorporated, cars into the train, whereby the quantum of the braking power of the train was reduced below the minimum prescribed by the statute, operated to be a violation of the statute by him, and not by the company against him, and as a consequence he could not recover, and therefore it was error to hold appellee only to contributory negligence and to assumed risk. The charge of the court undertakes to have the jury measure the acts and conduct of the conductor in two respects, and charges him with responsibility therefor if found to have been that way: First, if the conductor was required by the rules before operating the train to see that 75 per centum of the cars in the train were equipped with air brakes, and not to incorporate cars into the train if not so equipped, if by so doing it reduced the per centum below 75, and he voluntarily incorporated the two unequipped bad-order cars at Athens, whereby it did reduce the prescribed legal number in that train; or, second, if he instructed Rhoderick not to connect up the air hose around the cars to the caboose, and either of these acts of the conductor caused or contributed to the injury—he was held by the charge to be guilty of contributory negligence. The assumed risk portion applied the feature of knowing the fact that only a part of the train—less than 75 per centum—was connected up with air, and the danger arising from the operation of a train with only a portion thereof having the air connected up. The charge in the light of the evidence submitted issues made by the evidence. The coal hoist car and the two bad-order cars taken into the train at Athens had no air brakes on them at all, and the air was connected up and working from the engine to the end of the wrecking outfit, but was not connected up and working on the other part of the train, though there was no hose for the purpose. The evidence is conflicting as to whether the conductor ordered Rhoderick not to so connect the air hose from the wrecking outfit around the bad-order cars as to reach the caboose. Thus there was a failure to have 75 per centum of the cars in the train ahead of the caboose equipped with air brakes, and there was the further fact of operation of the train partly connected up with air. The blame therefor

is to be determined. Clearly in the facts the train was run in violation of the safety appliance act. And the blame for the cause that resulted in the violation of the law is traceable, either to the incorporation into the train of the merchandise cars, which made the statute at all applicable to that particular train, or to incorporating the two bad-order cars into the train at Athens, whereby the quantum of required braking power of the train was reduced below the minimum. The act of incorporating the merchandise cars into the train was by direct order of the dispatcher, as the testimony for appellee went to show; and the incorporation into the train of the two bad-order cars at Athens could reasonably be said by the jury, from all the evidence, to have been in the performance of duties expected of the conductor to do on that particular train which was being operated for the purposes it was. The fact that the two cars had no air brakes at all on them, by reason of their wrecked condition, would not be chargeable to the conductor. And the further fact that the two cars in such condition were to be incorporated into that train by the conductor as a part of the duties to be performed is a circumstance to be considered in determining the responsibility between master and servant for the violation of the law. Therefore, if the blame for the running of that train in violation of law is traceable, as between master and servant, either to the act of incorporating into the train the merchandise car, or to the act of incorporation of the two bad-order cars having no brake equipment, the appellant would not in the facts be relieved of the responsibility for the injury proximately caused by the violation for the appellee was strictly in performance of duties required in the furtherance of actual operation of that train. The act in effect imposes absolute liability upon appellant by providing that the doctrine of assumed risk and of contributory negligence shall not be available as defenses where there is a violation on the part of the railway which contributes to the injury. Article 6646, Rev. Stat. On the other hand, if connecting up the air to the caboose by running the hose around the coal hoist and two bad-order cars would have operated to be a practical means of safe operation of the train, and the hose was at hand for such purpose, and the rules of the company required the conductor to see that the air hose was connected up, and he negligently failed to do so, and such negligence was a concurring cause with the violation of the law on appellant's part, the defense of contributory negligence might be available. And likewise, if the conductor caused the train to be operated partly connected up with air, and a part not connected up that could have been, and he appreciated the danger arising from the operation, and the danger was such that a person of ordinary prudence would

not have taken the risk, he might be held to have assumed the risk. But in either event the obligation owing on the part of the conductor is by virtue of the rules imposing the duty, and the furnishing of the appliances by the appellant for the safety of the operation. It was such phase of the case, we think, presented by the evidence, that the court was having the jury determine. And in this case these were properly matters for the jury. The assignment is overruled.

We have carefully considered all the remaining assignments, and have reached the conclusion that they should be overruled.

The judgment is affirmed.

### On Motion for Rehearing.

[6] The motion has been carefully considered, and the conclusion reached by a majority of the court that the facts of the case made it error to hold that no reversible error was presented by the third assignment of error, complaining of the court's charge. It is believed that the court's charge was error in holding appellee only to contributory negligence or assumed risk. If appellee voluntarily incorporated into the train at Athens the two bad-order cars, and thereby the braking power of the train was reduced below the 75 per centum prescribed by law, appellee would be precluded of any recovery for an injury proximately caused by such violation of the law on his own part, and the jury should have been in effect so told by the court.

The writer does not agree to the effect given the evidence by the majority, and hence thinks the charge should not be deemed misleading and prejudicial.

According to the views of the majority of the court, the motion should be granted, and accordingly the judgment is reversed and cause remanded, and it is so ordered.